IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| **BYONCA LOGAN,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civ. Action No. 1:22-00237-KD-MU |
| | ) |
| **CITY OF MOBILE and MICHAEL ISRAEL,** | ) |
| | ) |
| | ) |
| Defendants. | ) |

## ORDER

This matter is before the Court on Defendants The City of Mobile, Alabama (the "City") and Micah Israel's[1] ("Officer Israel") (collectively "Defendants") Motion for Summary Judgment, (Doc. 34), and evidentiary material in support thereof, Plaintiff Byonca Logan's ("Logan" or "Plaintiff") Response in Opposition, (Doc. 41), and evidentiary material in support thereof, and Defendants' Reply, (Doc. 42). Upon consideration and for the reasons set forth herein, it is **ORDERED** that Defendants' Motion for Summary Judgment, (Doc. 34), is **GRANTED**.

**I.      BACKGROUND**

**A.  Officer Israel and Ms. Logan's Prior "History"**

Ms. Logan stated in her deposition that she first met Officer Israel in 2020, while they both worked at Compass Urgent Care during the COVID-19 Pandemic. (Doc. 41-1 at 5; Doc. 41 at 3). She claimed Officer Israel was directing traffic from the testing lines. (Doc. 41-1 at 5). They became acquainted, and he purportedly asked for her number, which she did not give to him. (Id. at 6). Ms. Logan said that, when she oversaw traffic one day, she reached out "under [her]

---

[1] Defendants point out that Officer Israel is incorrectly named in the Complaint, and consequently in the style of the case, as "Michael Israel." (Doc. 34 at 1).

manager's orders to see where he was," allowing Officer Israel to get her number. (Id.). He allegedly sent her some text messages to which she did not respond. (Id.). Officer Israel acknowledged that it was possible that he asked for her number and admitted that he was attracted to her. (Doc. 41-2 at 13-14). Per Ms. Logan, Officer Israel became offended at her rejection. (Doc. 41-1 at 10). This supposedly culminated in a scene at work in which Officer Israel felt disrespected when Ms. Logan called him by his first name. (Id. at 7). Meanwhile, Officer Israel denied ever being offended or hurt that Ms. Logan rejected his advances. (Doc. 35-6 at 17).

### B. The Melee on Dauphin Street

Fast forward to November 27, 2021, when Ms. Logan went to downtown Mobile to meet up with friends and watch the Iron Bowl. (Doc. 34 at 2; Doc. 41 at 7). After the game, she eventually met a friend at the Lit Cigar Lounge on Dauphin Street before heading home to change. (Id.). Ms. Logan returned to the Lit Cigar Lounge around 9:00 p.m. to meet up with different friends and was drinking alcohol. (Id.). The bar was crowded, and Ms. Logan got pushed into a woman who was not pleased about being pushed. (Doc. 34 at 3; Doc. 41 at 7). According to Ms. Logan, the woman was "hung up" on being pushed, which "kind of threw the energy off in there." (Doc. 35-1 at 9). Subsequently, Logan and her friends decided to leave Lit Cigar Lounge for Lure, a bar farther east on Dauphin Street. (Doc. 34 at 3; Doc. 41 at 7). Walking out, the woman into whom Ms. Logan was pushed threw a drink at Logan and her friends, which prompted hollering and cursing between the woman and Logan's friends. (Id.). Unbeknownst to Logan and her friends, a separate group of unknown women were waiting outside of the Lit Cigar Lounge, one of whom sprayed mace or pepper spray into Logan's face. (Id.). "And from there, I mean, a fight occurred." (Doc. 35-1 at 10). Ms. Logan does not dispute

2

that she was involved in this fight, and that "she was throwing and taking punches with at least two different women." (Doc. 41 at 7). Bystander video footage indicates that Logan, a woman with long, brown hair wearing a brown and white outfit, was fighting several different women. (Docs. 35-3; 35-4; 35-5). Logan can be seen trading punches with a woman in a red shirt as they both hit the ground and got back up. (Doc. 35-3). After a woman in a white sweater tried to grab Logan's wrist, Logan hit her several times, and a woman with long, orange hair wearing a blue hat joined the other in fighting off Logan. (Doc. 35-4). Logan was then pitted against the wall of one of the buildings on Dauphin Street before again hitting the ground, all the while trading kicks, shoves, and slaps with numerous others. (Doc. 35-5). Meanwhile, a crowd gathered around can be seen watching, jeering, and filming as the scuffle takes place. (Docs. 35-3; 35-4; 35-5).

C.  **Ms. Logan's Arrest and the Complained-Of Injury**

According to Officer Israel, given the "hectic" nature of the club scene following the Iron Bowl, he was stationed in the area of Dauphin Street and North Jackson Street that same night. (Doc. 35-6 at 18). Officer Israel supposedly saw a crowd of people running over to a fight involving women. (Id.). Per Officer Israel, he and his supervisor, Officer Byrd, walked up to the altercation in which Ms. Logan and other women, including Allenson Ingram, were "scuffling around," with "blows on both sides still being thrown." (Doc. 35-6 at 20-21). Body-worn camera (BWC) footage from Sergeant Gibbs, (Doc. 35-7, 00:00-01:30), and Officer Byrd, (Doc. 35-10, 0:00-01:00), confirms that the police officers, including Officer Israel, a black male with short hair, approached what looks like the mostly finished Dauphin Street confrontation. Logan can be seen facing the woman with long, orange hair as that woman was pinned up against the wall of a building. (Doc. 35-7, 01:05-01:08). Logan can also be seen in Officer Israel's BWC footage.

3

(Doc. 40, Ex. D, 00:32). Suddenly, Ingram and the woman with long, orange hair started slapping each other and Ingram can be seen pulling her hair before the officers broke up the fight and handcuffed Ingram. (Doc. 35-7, 01:38-02:00; Doc. 35-10, 1:18-1:40).

Officer Israel asserted in his deposition that Ms. Logan was still trying to fight with Ingram while Ingram and the lady with orange hair were tussling. (Doc. 35-6 at 22). Logan disputes that she attempted to engage in this fight, the "insinuation" that she subsequently struck Officer Israel with her right arm, and that her arm came down on Officer Israel. (Doc. 41 at 8). Meanwhile, Sergeant Gibbs' BWC footage shows Logan's leg touching Ingram, who was on the ground being handcuffed, and Logan's arm reaching for Ingram and then touching Officer Israel, who was assisting with Ingram's arrest. (Doc. 35-7, 01:56-02:00). Bystander video confirms that Logan reached for Ingram while Sergeant Gibbs and Officer Israel were in the process of restraining Ingram, and that Sergeant Gibbs shoved Logan backward before she tried to walk away. (Doc. 35-11, 00:00-00:05). Plaintiff does not dispute that she was shoved. (Doc. 41 at 8). Officer Israel can then be seen beelining towards Logan. (Doc. 35-7, 02:00-02:03). According to Officer Israel, he knew that Logan was attempting to reach Ingram and in so doing, Ms. Logan hit him with a fist. (Doc. 35-6 at 24-25). After confirming with Sergeant Gibbs that Gibbs was able to complete handcuffing Ingram, Officer Israel went to detain Ms. Logan. (Id. at 25). He directed her to a building on the south side of Dauphin Street to keep her separated. (Id.).

At that point, Officer Israel grabbed Ms. Logan's right arm with his right arm before pushing her against the wall of a building. (Doc. 35-13, 0:00-0:10). Officer Israel can be heard telling the crowd to "back up" and "move." (Id., 0:04-0:07). After the video briefly pans away, Ms. Logan can then be seen facing Officer Israel. (Id., 0:12-0:17). Officer Israel held Logan's right wrist with his left hand and had his right arm on her right shoulder. (Id.). Officer Israel then attempted

4

to spin Logan around to again face the wall by pushing her right arm behind her with his left hand while moving her body in the same direction with his right arm. (Id., 0:19-0:25). They both spun around before Officer Israel finally had Logan against the wall again. (Id., 0:20-0:30). Logan then placed both hands behind her back. (Id.). Officer Byrd then entered the scene and handcuffed Logan while Officer Israel backed away. (Id., 0:30-0:40). On Officer Byrd's BWC footage, Logan can be heard telling Officer Israel, "I'm not fighting you!" (Doc. 35-10, 02:10-02:14). She repeated to Officer Byrd that she was not fighting Officer Israel while Officer Byrd was handcuffing her. (Id., 02:22-02:24).

Ms. Logan "does not dispute the objective physical actions that are depicted" in the bystander video. (Doc. 41 at 9). She stated in her deposition that she approached the officers handcuffing Ingram to try to "clear" one of her friends of wrongdoing to the officers but then Officer Israel saw her, who "grabbed [her] from the back." (Doc. 35-1 at 13). She remembered being "pulled, twisted, thrown." (Id.). Ms. Logan also testified that she did not resist Officer's Israel's attempt to arrest her, that Officer Israel "knew who [she] was" during the arrest, and that when she asked him why he was arresting her, he told her, "Shut the fuck up, you just hit me." (Doc. 41-1 at 18). Officer Israel, on the other hand, testified that he gave her verbal commands to turn around and stop moving but that she failed to comply. (Doc. 35-6 at 31-32). He explained that he was attempting to put handcuffs on her but did not because she "kept turning around" and "kept not complying." (Id. at 32). Officer Israel disputed that he recognized Ms. Logan at the time he attempted to handcuff her. (Id. at 15-16) ("If I would have seen her probably more than that, yeah, but at that time I still had a job to do.").

Once in handcuffs, Ms. Logan told Officer Byrd, "I really think my shoulder's broke." (Doc. 35-10, 06:18-06:20). "I really think my arm's broke." (Id., 06:28-06:30). Officer Byrd can be

heard calling EMS for her. (Id., 07:05-07:14). Officer Byrd placed Logan briefly in the back of his police vehicle, and after discussing the fight with the other officers, removed the handcuffs from Logan. (Id., 08:52-14:02). EMS personnel spoke with Logan while she was sitting in the back of Officer Byrd's patrol car, and she told them that her right arm was broken. (Id., 17:30-17:43). Ms. Logan later told Officer Byrd that EMS confirmed that her arm was broken but that she would rather go to her work – an urgent care – in the morning to get a cast than go to the hospital that night. (Id., 28:42-28:52); (see also Doc. 35-1 at 14) (Q: "Okay. You did not want to have an ambulance ride to the hospital?" A: "No. I knew my arm was broken. There's nothing the hospital would have done for me at that time."). Medical records indicate that Logan sought treatment from her employer, Compass Urgent Care, the following day for a fractured right humerus. (Doc. 35-15). She initially reported that the fracture was the result of a scooter accident. (Id. at 3). Ms. Logan later returned, after speaking with her lawyer, to update her medical records to reflect the interaction with Officer Israel as the cause of her injury. (Id. at 7); (Doc. 41 at 11-12) ("[Ms. Logan] does not dispute that, due to the embarrassing nature of the incident and this being her workplace, she reported to Compass Urgent Care that her arm was broken because of a scooter accident. She does not dispute that she requested Compass Urgent Care to change the cause of her fracture from falling off a scooter to the true cause which was the encounter with Israel. She does not dispute that she did so after she spoke with her attorney but does dispute any intimation that the statement was coaxed or untrue as she made the same report to the City of Mobile before she ever spoke with an attorney."). Logan's broken right humerus required surgery, during which the surgeon implanted eleven steel screws and two steel rods from her shoulder to her elbow. (Doc. 41 at 19).

### D. The Instant Litigation

Plaintiff brings this lawsuit against the City and Officer Israel. (Doc. 1). Plaintiff lists four claims in her Complaint: "violation of the Fourth Amendment rights of Plaintiff by Defendant Michael Israel (excessive force)"; "Plaintiff's claim against Officer Israel individually for excessive force under Section 1983 violation of the Fourth Amendment"; "Plaintiff's claim [against the] City of Mobile for excessive force and false arrest under Section 1983 violation of the Fourth Amendment and the Alabama Code"; and "Plaintiff's claim against Officer Israel individually for false arrest under Section 1983 violation of the Fourth Amendment." (Id. at 4-7).

## II. LEGAL STANDARD

District courts shall grant summary judgment when the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant always bears the initial responsibility of informing the district court of the basis for its motion and identifying the parts of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c). The non-moving party generally must use these same categories of evidence to support the inference that a material fact is genuinely disputed. Fed. R. Civ. P. 56(c). In assessing whether the movant has met its burden, the Court should view the evidence and all factual inferences therefrom in the light most favorable to the non-movant and resolve all reasonable doubts about in the facts in her favor. Burton v. City of Belle Glade, 178 F.3d 1175, 1187 (11th Cir. 1999); see also Fils v. City of Aventura, 647 F.3d 1272, 1288 (11th Cir. 2011) ("At summary judgment, we cannot simply accept the officer's subjective version of

events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances.").

The substantive law identifies which facts are material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id.; see also Cunningham v. AutoZoners, LLC, No. 12-CV-00538-KD-B, 2013 WL 6008566, at *6 (S.D. Ala. Nov. 13, 2013) ("However, the mere existence of any factual dispute will not automatically necessitate denial of a motion for summary judgment; rather, only factual disputes that are material preclude entry of summary judgment."). A dispute is genuine if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 807 (11th Cir. 2010) (en banc).

While the Supreme Court did not alter the above summary judgment standard in Scott v. Harris, it held that when documentary evidence blatantly contradicts a plaintiff's account so that no reasonable jury could believe it, a court should not credit the plaintiff's version on summary judgment. 550 U.S. 372, 380 (2007); Morton v. Kirkwood, 707 F.3d 1276, 1284 (11th Cir. 2013) ("[W]here an accurate video recording completely and clearly contradicts a party's testimony, that testimony becomes incredible."). Pursuant to these cases, in a case in which neither side disputed the authenticity of a video recording or suggested it had been manipulated in any way, this Court accepted its contents for summary judgment purposes "notwithstanding any party's contrary or inconsistent statements." Windham v. City of Fairhope, 20 F. Supp. 3d 1323, 1329 (S.D. Ala. 2014); but see Shaw v. City of Selma, 884 F.3d 1093, 1097 n.1 (11th Cir. 2018) ("But where the recording does not clearly depict an event or action, and there is evidence going both

8

ways on it, we take the [plaintiff's] version of what happened."), and Cantu v. City of Dothan, Ala., 974 F.3d 1217, 1226 (11th Cir. 2020) (clarifying that when video evidence "does not answer all of the questions" such that material factual issues persist, the court's obligation to construe the evidence in the light most favorable to the non-moving party will tip the scales against summary judgment).

### III.  ANALYSIS

**A.  The Court Grants Summary Judgment as to All Claims Against the City**

Plaintiff lists four claims in her Complaint: "violation of the Fourth Amendment rights of Plaintiff by Defendant Michael Israel (excessive force)"; "Plaintiff's claim against Officer Israel individually for excessive force under Section 1983 violation of the Fourth Amendment"; "Plaintiff's claim City of Mobile for excessive force and false arrest under Section 1983 violation of the Fourth Amendment and the Alabama Code"; and "Plaintiff's claim against Officer Israel individually for false arrest under Section 1983 violation of the Fourth Amendment." (Doc. 1 at 4-7). To the extent that the first count is substantively different from the second count by omitting the word "individually" – and therefore aims to sue Officer Israel in his "official capacity" – this is legally no different from a suit against the City, Officer Israel's employer.[2] Ms. Logan indicates in her Response to Defendants' Motion for Summary Judgment that she does not contest that the City is entitled to summary judgment. (Doc. 41 at 12). The Court accepts Plaintiff's concession and **GRANTS** Defendants' Motion for Summary Judgment,

---

[2] A suit against a state official in his or her official capacity for damages is not a suit against the official but rather is a suit against the official's office. Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 (1989); Hafer v. Melo, 502 U.S. 21, 25 (1991) ("[T]he real party in interest in an official-capacity suit is the governmental entity and not the named official . . . ."). That said, state officials may be sued in their official capacity for injunctive relief. Will, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State.") (internal quotations omitted); see also Ex parte Young, 209 U.S. 123 (1908).

(Doc. 34), as to all claims against the City.³ Consequently, Plaintiff has two claims remaining at this stage, which are both against Defendant Officer Israel in his individual capacity: for false arrest and excessive force in violation of the Fourth Amendment via Section 1983. (See also Doc. 41) (arguing that Officer Israel is not entitled to qualified immunity with respect to Plaintiff's excessive force and false arrest claims against him).

### B. Officer Israel's Individual Liability is Barred by Qualified Immunity, Entitling Him to Summary Judgment as to Plaintiff's False Arrest and Excessive Force Claims

Section 1983 provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983. § 1983 is not a source of substantive rights but a mechanism for vindicating federal rights conferred by the Constitution and federal statutes. Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979). To prevail on a Section 1983 claim, the plaintiff must show that the conduct complained of: (1) was committed by a person acting under color of state law; and (2) deprived the plaintiff of rights, privileges, or immunities secured by the Constitution or laws of the United States. Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992).

Even when a plaintiff can prove the elements of a § 1983 claim, qualified immunity can block the recovery of damages. Clinch v. Chambers, No. 2:22-CV-94, 2024 WL 644567, at *6

---

³ See, e.g., Lambert v. FedEx Ground Package Sys., Inc., No. 1:22-CV-740, 2024 WL 253622, at *2 n.3 (N.D. Ga. Jan. 23, 2024) ("The Court accepts the Plaintiff's concession and will grant summary judgment in the Defendant's favor on these claims."); Powell v. Am. Remediation & Env't, Inc., 61 F. Supp. 3d 1244, 1253 n.9 (S.D. Ala. 2014) ("[W]here the non-moving party fails to address a particular claim asserted in the summary judgment motion but has responded to other claims made by the movant, the district court may properly consider the non-movant's default as intentional and therefore consider the claim abandoned."), aff'd, 618 F. App'x 974 (11th Cir. 2015).

(S.D. Ga. Feb. 15, 2024); see also Pierson v. Ray, 386 U.S. 547, 553-55 (1967) (holding that qualified immunity, when applicable, protects police officers). Qualified immunity is a defense that must be affirmatively plead. Siegert v. Gilley, 500 U.S. 226, 231 (1991). That said, once a police officer raises a qualified immunity defense, the burden of persuasion as to that issue is on the plaintiff. Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997). While technically interlocutory in nature, a district court's denial of a qualified immunity finding is nonetheless immediately appealable under the collateral order doctrine. See Mitchell v. Forsyth, 472 U.S. 511, 524-30 (1985) (explaining that qualified immunity is an immunity from suit rather than a mere defense to liability and is "effectively lost if a case is erroneously permitted to go to trial"); but see Johnson v. Jones, 515 U.S. 304, 319-20 (1995) (holding that a defendant who is entitled to a qualified immunity defense "may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial").

To receive qualified immunity, the officer must first prove that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred. Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002). Here, Plaintiff does not dispute that Officer Israel was acting within the scope of his discretionary authority when he purportedly injured her. (See Doc. 41); see also Horn v. Barron, 720 F. App'x 557, 562 (11th Cir. 2018) (per curiam) ("It is undisputed in this case that Officer Barron was acting within the scope of his discretionary authority while providing security and keeping the peace at a public venue."). The burden therefore shifts to Plaintiff to show that: (1) Officer Israel violated her federal statutory or constitutional right(s); and (2) the unlawfulness of his conduct was "clearly established at the time." District of Columbia v. Wesby, 583 U.S. 48, 62-63 (2018); Edwards v. Shanley, 666 F.3d 1289, 1294 (11th

11

Cir. 2012) ("Once discretionary authority is established, the burden then shifts to the plaintiff to show that qualified immunity should not apply."). Courts are no longer obligated to determine first whether the plaintiff suffered the deprivation of a constitutional right. Pearson v. Callahan, 555 U.S. 223 (2009). In other words, district courts may exercise their discretion to analyze the qualified immunity defense under one of the two prongs based on the circumstances. Id. at 236; cf. Edger, 84 F.4th at 1235 ("The test is conjunctive, and if a plaintiff fails either prong of the qualified immunity analysis, his claim is barred.").

1. **There is Insufficient Evidence to Support Plaintiff's Claim that She Was Falsely Arrested in Violation of the Fourth Amendment**

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated." U.S. Const. amend. IV. For Fourth Amendment purposes, an arrest is a "seizure" of the person, the "reasonableness" of which is determined by the presence or absence of probable cause for the arrest. Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir. 2007). Put differently, an officer violates a person's Fourth Amendment right against unreasonable seizures if the officer arrests that person without probable cause supporting the arrest. Garcia v. Casey, 75 F.4th 1176, 1186 (11th Cir. 2023). Probable cause exists where a reasonable officer *could conclude* – considering the totality of the circumstances – that there was a substantial chance of criminal activity. Edger, 84 F.4th at 1236 (citing Wesby, 583 U.S. at 60-61, and noting that the probable cause standard articulated in Wesby is "strikingly similar" to the Eleventh Circuit's well-established "arguable" probable cause standard); see also Lee, 284 F.3d at 1195 ("Arguable probable cause exists where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant *could have believed* that probable cause existed to arrest.") (cleaned up and emphasis added). In the false arrest context, arguable probable cause exists if a reasonable officer, "looking

12

at the entire legal landscape at the time" of the arrest, could have interpreted the law as permitting the arrest. Garcia, 75 F.4th at 1186. This inquiry must be driven by the specific context of the case. Edger, 84 F.4th at 1237. Whether an officer possesses actual or arguable therefore depends on the elements of the alleged crime and the operative fact pattern. Id. Additionally, a police officer that has probable cause to believe that an individual has committed "even a very minor criminal offense in his presence" is entitled to execute a full custodial arrest without violating the Fourth Amendment. Atwater v. City of Lago Vista, 532 U.S. 318, 354 (2001).

      Here, Sergeant Gibbs' BWC footage confirms that the police officers, including Officer Israel, approached the remnants of the Dauphin Street fight and that Ms. Logan can be seen facing the woman with long, orange hair as that woman was pinned up against the wall of a building. (Doc. 35-7, 01:05-01:08). Logan can also be seen in Officer Israel's BWC footage. (Doc. 40, Ex. D, 00:32). Sergeant Gibbs' footage shows that while the officers were breaking up the fight between Ingram and the orange-haired lady and handcuffing Ingram, Logan's leg touched Ingram and Logan's arm reached for Ingram and then touched Officer Israel,[4] who was assisting with Ingram's arrest. (Doc. 35-7, 01:56-02:00). Bystander video confirms that Logan reached for Ingram while Sergeant Gibbs and Officer Israel were in the process of restraining Ingram. (Doc. 35-11). Officer Israel can then be seen going towards Logan. (Doc. 35-7, 02:00-02:03). At that point, Officer Israel grabbed Ms. Logan's right arm with his right arm before pushing her against the wall of a building. (Doc. 35-13, 0:00-0:10).

---

[4] Logan disputes that "she struck Israel with her right arm" and that "her arm came down on Officer Israel." (Doc. 41 at 8). The Court will accept the clear contents of video recordings whose authenticity is undisputed for summary judgment purposes notwithstanding any party's statements to the contrary. City of Fairhope, 20 F. Supp. 3d at 1329.

Officer Israel had probable cause to arrest under both Wesby and the Eleventh Circuit's analogous "arguable" probable cause standard.[5] The Alabama Criminal Code stipulates that a person commits the crime of disorderly conduct if, "with the intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof," she engages in fighting. Ala. Code § 13A-11-7(a)(1). A person commits the crime of harassment if, "with intent to harass, annoy, or alarm another person," she "[s]trikes, shoves, kicks, or otherwise touches a person or subjects him or her to physical contact." § 13A-11-8(a)(1)(a). A reasonable officer witnessing Logan in the aftermath of a street fight and subsequently lunging after a person being actively arrested could conclude – considering the totality of the circumstances – that there was a substantial chance that she was violating the Alabama criminal prohibitions against disorderly conduct for fighting and harassment. That these are misdemeanor offenses is of no constitutional moment with respect to Plaintiff's false arrest claim. See Atwater, 532 U.S. at 354. Accordingly, probable cause existed for Officer Israel to arrest Ms. Logan for multiple misdemeanor offenses, for which he was constitutionally entitled to execute a full custodial arrest. See Lee, 284 F.3d at 1196 ("When an officer lawfully arrests an individual for the commission of a crime, no matter how minor the offense, the officer is entitled under controlling Supreme Court precedent to effectuate a full custodial arrest.").

Nor would it matter, in the context of a Fourth Amendment false arrest claim in which probable cause to arrest existed, whether Officer Israel may have had an ulterior motive in arresting Logan – perhaps as retribution for his unrequited advances, as Plaintiff would have us

---

[5] Because Officer Israel had probable cause to arrest Ms. Logan for the crime of disorderly conduct, the Court need not assess whether her seizure was more akin to an investigatory detainment or a de facto arrest. See U.S. v. Kapperman, 764 F.2d 786, 790 n.4 (11th Cir. 1985) (establishing that neither handcuffs nor other restrains will automatically convert a Terry stop into a de facto arrest requiring probable cause and that the relevant inquiry in either context is reasonableness).

believe. (Doc. 41 at 24) ("Out of the multitude of people out that night, with some actively brawling, he singled out the one whom he had been previously attract to, to detain."); see Whren v. U.S., 517 U.S. 806, 813 (1996) ("We think these cases foreclose any argument that the constitutional reasonableness of traffic stops depends on the actual motivations of the individual officers involved . . . Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."). The Court **GRANTS** Defendants' Motion for Summary Judgment, (Doc. 34), as to Plaintiff's claim against Defendant Officer Israel in his individual capacity for false arrest in violation of the Fourth Amendment.

    **2. There is Insufficient Evidence to Support Plaintiff's Claim that She Was Subject to Excessive Force in Violation of the Fourth Amendment**

Probable cause to arrest will not justify using excessive force to detain a suspect. Kapperman, 764 F.2d at 790 n.4; Lee, 284 F.3d at 1197 ("The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from excessive force in the course of an arrest."). "[T]he 'reasonableness' of a particular seizure depends not only on *when* it is made, but also on *how* it is carried out." Graham v. Connor, 490 U.S. 386, 395 (1989) (emphasis included) (citing Tenn. v. Garner, 471 U.S. 1, 7-8 (1985)). Determining whether the force used to effectuate a particular seizure is "reasonable" for Fourth Amendment purposes necessitates balancing "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Garner, 471 U.S. at 8. "Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. But the test is not capable of "precise definition" or "mechanical application." Bell v. Wolfish, 441 U.S. 520, 559 (1979). It requires careful attention to the facts of each case,

including: the severity of the crime at issue; whether the suspect poses an immediate threat to the safety of the officers or others; and whether he is actively resisting arrest or attempting to evade arrest by flight. Graham, 490 U.S. at 396. The Eleventh Circuit has also considered the related factors of the need for the application of force; the relationship between the need and the amount of force used; and the extent of the injury inflicted. Lee, 284 F.3d at 1198.

District courts are prohibited from playing Monday-morning quarterback in this inquiry; the "reasonableness" of the officer's force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. As such, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers," violates the Fourth Amendment. Id. Further, this is an objective inquiry that focuses on the objective reasonableness of the officer's conduct under the facts and circumstances confronting them, *without considering any underlying intent or motivation*. Id. at 397 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force . . . .").

The gratuitous use of force when a criminal suspect is not resisting is excessive force that violates the Fourth Amendment. Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008); see also Lee, 284 F.3d at 1198 (finding excessive force when the defendant police officer slammed the plaintiff's head against the trunk of her car after she was arrested and secured in handcuffs); and Slicker v. Jackson, 215 F.3d 1225, 1233 (11th Cir. 2000) (denying that the officers were entitled to qualified immunity when evidence showed that they kicked the plaintiff in the head and beat his head on the ground despite not resisting).

But an officer's application of de minimis force, without more, will not support a claim of excessive force in violation of the Fourth Amendment. Nolin v. Isbell, 207 F.3d 1253, 1257 (11th

Cir. 2000). In an unpublished opinion, the Eleventh Circuit reversed the district court's denial of qualified immunity to the police officer at the summary judgment stage when the officer's use of a "soft hands, straight arm bar takedown technique"[6] in arresting the plaintiff for disorderly conduct resulted in her arm breaking. Horn, 720 F. App'x at 564 ("Even assuming that Horn was totally compliant with Officer Brown, he was allowed to use some force in effecting her arrest. And, even if the force applied by Officer Barron in effecting her arrest . . . was unnecessary, it was not unlawful."). The Eleventh Circuit found no excessive force in a case where the officer grabbed the plaintiff's arm, twisted it around his back, jerked it up high to the shoulder, and subsequently handcuffed him while he "fell to his knees screaming that [the officer] was hurting him," causing the plaintiff to endure more than twenty-five subsequent surgeries and amputation of the arm below the elbow. Rodriguez v. Farrell, 280 F.3d 1341, 1351 (11th Cir. 2002); see also Alexandre v. Ortiz, 789 F. App'x 169, 175 (11th Cir. 2019) (per curiam) ("Nor does the fact that Alexandre suffered an injury defeat qualified immunity for Ortiz. Although unfortunate, assuming Alexandre's injury occurred while Ortiz and the other officers took down Alexandre during the normal course of an arrest, Ortiz was not put on notice that those actions were potentially unlawful. We consider the circumstances surrounding the arrest and do not rely on an ex post assessment of the resulting injury."); but see Stephens v. DeGiovanni, 852 F.3d 1298, 1325 (11th Cir. 2017) ("*The nature and extent of physical injuries sustained by a plaintiff are relevant in determining whether the amount and type of force used by the arresting officer were excessive.*") (emphasis included).

---

[6] The court described the use of the technique as the officer "taking hold of [the arrestee's] left arm, putting his right arm over her left arm, and using gravity and his own weight to bring her to the ground." Horn, 720 F. App'x at 564.

Assuming that Logan's arm broke while Officer Israel attempted to effectuate her arrest,[7] his actions did not constitute excessive force violative of the Fourth Amendment. Segreant Gibbs' BWC footage shows Officer Israel heading for Logan immediately after she reached for Ingram and touched Israel *while* the officers were restraining Ingram. (Doc. 35-7, 01:56-02:03). A reasonable officer on the scene of an unsettled street fight could conclude that force would be necessary to restrain an individual trying to interfere with another brawler's arrest. See Lee, 284 F.3d at 1198 n.7 (holding that district courts may still consider "the need for the application of force" as a factor in determining if the officer's force was reasonable after Graham). Certainly, disorderly conduct is not usually a serious offense. See Horn, 720 F. App'x at 563 ("With respect to the severity of her crime, it is undisputed that Officer Barron arrested Horn for a non-serious offense, disorderly conduct."). However, a reasonable officer in Officer Israel's shoes could have justifiably inferred – particularly in the blur of the moment – that Logan posed an immediate threat to his and the other officers' safety. See Graham, 490 U.S. at 396 (including "whether the suspect poses an immediate threat to the safety of the officers or others" as a Fourth Amendment reasonableness factor). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Id. at 396-97.

Regardless of the above factors in Officer Israel's favor, Officer Israel was entitled to use some force in arresting Logan. See Horn, 720 F. App'x at 564; Graham, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or

---

[7] Defendants argue that the record evidence contradicts Plaintiff's claim that Officer Israel broke her arm. (Doc. 42 at 9-10). Because, even assuming that Officer Israel broke Logan's arm, Defendant Israel is not liable for excessive force, the Court disregards this contention for purposes of this Order.

investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."). Bystander video indicates that Officer Israel initiated a permissible "soft hands" takedown maneuver after Logan flipped from facing the wall – where she could have been easily handcuffed – to facing Officer Israel. (Doc. 35-13, 0:04-0:26); see Horn, 720 F. App'x at 564 ("[E]ven if the force applied by Officer Barron in effecting Horn's arrest – a soft hands, straight arm bar takedown technique, by which he gained control of her by taking hold of her left arm, putting his right arm over her left arm, and using gravity and his own weight to bring her to the ground – was unnecessary, it was not unlawful."). That the maneuver may have been somewhat gracelessly executed and unfortunately resulted in Plaintiff's broken arm and subsequent surgery does not alter the conclusion that Officer Israel's use of force was de minimis under the circumstances. See Alexandre, 789 F. App'x at 175 ("Nor does the fact that Alexandre suffered an injury defeat qualified immunity for Ortiz . . . We consider the circumstances surrounding the arrest and do not rely solely on an ex post assessment of the resulting injury.").

The fact that Logan was unrestrained at the time of the applied force also distinguishes this case from those in which the Eleventh Circuit found the officer's use of force to be gratuitous. E.g., Fils, 647 F.3d 1272; Hadley, 526 F.3d 1324; Lee, 284 F.3d 1188; Vinyard v. Wilson, 311 F.3d 1340 (11th Cir. 2002); Slicker, 215 F.3d 1225; Popham v. City of Kennesaw, 820 F.2d 1570 (11th Cir. 1987). "All of these cases present instances of gratuitous and sadistic force used against compliant suspects. Here, however, Horn was not restrained and had, undisputedly, pulled her arm away from Officer Barron. The force that Officer Barron used, therefore, was not gratuitous." Horn, 720 F. App'x at 564.[8] Finally, "excessive force is judged

---

[8] See also id. at 565 ("Officer Barron was entitled to use some degree of force to put her in the handcuffing posture. Officer Barron used a minimal level of force – a soft hands, straight arm bar takedown technique – to do so. He did not use a weapon, he did not hit, punch, or kick her, he did not have assistance from multiple officers, he did not

19

*solely* on an objective basis." Hadley, 526 F.3d at 1330 (emphasis added). Officer Israel's motive behind applying the objectively reasonable, de minimis force at issue is consequently irrelevant. Because it determines that Officer Israel did not use excessive force while effecting Logan's arrest, the Court need not analyze whether Officer Israel violated clearly established law. See Edger, 84 F.4th at 1235 ("[I]f a plaintiff fails either prong of the qualified immunity analysis, his claim is barred."). The Court therefore **GRANTS** Defendants' Motion for Summary Judgment, (Doc. 34), as to Plaintiff's claim against Defendant Officer Israel in his individual capacity for excessive force in violation of the Fourth Amendment.

## IV. CONCLUSION

For the reasons set forth herein, Defendants' Motion for Summary Judgment, (Doc. 34), is **GRANTED**. Judgment shall be entered by separate document as provided in Federal Rule of Civil Procedure 58(a).

**DONE** and **ORDERED** this the **1st** day of **April 2024.**

> **/s/ Kristi K. DuBose**
> **KRISTI K. DuBOSE**
> **UNITED STATES DISTRICT JUDGE**

---

'throw' Horn to the ground with intentional, or gratuitous, unwanted force, nor did he use any force against her after she was on the ground. He did not use any force intended to cause injury; rather, Horn's injury was the unfortunate result of Officer Barron's reasonable use of force.").